The next case is a call for oral argument, People v. Waddell. Counsel, whenever you're ready, you may proceed. Thank you, Your Honor. Excuse me. May it please the Court, Counsel. I am Fred Johnson, and I represent the defendant, Melinda Waddell. I ask that you reverse the trial court because Officer Fears' search of the defendant's purse was, number one, without a warrant, number two, non-consensual, number three, not done for the purpose of gathering information to diagnose or treat the defendant, and number four, the only purpose of the search of the defendant's purse was to complete a routine police report. At page 22 and 23 of the common law record, a portion of the testimony of Officer Fears appears. The following question was posed to Officer Fears, and just a couple of other questions. Your sole reason, then, for looking into the purse was to get a driver's license to complete a police report. Answer, yes. At another time, the officer was asked, what was your reason you were looking for the driver's license? So I could complete a police report. Officer Fears left no doubt that his search of this purpose, of this purse, was for a limited purpose to complete a routine police report. I ask this panel to follow the reasoning of the unanimous en banc decision of the Colorado Supreme Court in People v. Wright that appears in my reply. That decision of the Colorado Supreme Court was adopted and followed by the Arkansas Appellate Court in Evans v. State, which likewise appears in my reply. If I could condense my entire argument to this panel, I would do so by saying, please read carefully the decision of the Colorado Supreme Court in People v. Wright that appears in my reply. Once the defendant establishes a warrantless search took place, the burden is on the State to advance a recognized exception to the warrant requirement. A person, in this case a young woman, has a high expectation of privacy in the contents of her purse. The State offered no evidence that Officer Fears' search of that purpose was done other than to obtain information so that a routine police report could be done. Officer Fears' motive is highly important in this case. The State tries to advance a number of reasons why this search should be justified. We do not object to Officer Fears taking charge of that purse to take it out of the elements in the rain. That was appropriate. But going the next step after seizing the purse and conducting a search was inappropriate. In this particular case, the trial court tried to justify the search on the ground of the community caretaking doctrine. According to the trial judge, an insurance company or others might find useful the information that would be on a police report and therefore the police officer was justified in rummaging through or looking through the defendant's purse. I submit to this panel that such reasoning is inappropriate and, in my opinion, outrageous. The community caretaking doctrine is focused on providing assistance to non-law enforcement personnel, namely citizens. One prong of that doctrine has to do with the emergency assistance that police officers often provide. For example, in the case of an accident where the police officer was motivated to find information in a driver's license such as whether the person was diabetic or had a medical condition, there is a recognized exception for that purpose. But if the police officer candidly admits under oath that that's not my purpose in doing the search, it is improper for the state to try and justify it on a hypothetical situation that does not exist. And I just quoted to you two passages from Officer Feer's testimony at the preliminary hearing and later at the suppression hearing, and we had an agreement that the transcript from the preliminary hearing would be considered at the suppression hearing, where Officer Feer made clear that he was not doing this search for anything other than to finish out a police report. When I pressed him on details about what it was in the police report that he needed a driver's license for, he said details on her without any further explanation. So as this court looks at what actually took place, the emergency assistance prong of the community caretaking doctrine should be taken out of the equation. There are host instances in the community caretaking doctrine cited by our Supreme Court in Ludeman where a police officer, for example, is trying to help somebody find a stray animal or there was a cat that was on a moving vehicle that a police officer stopped the vehicle in order to let the driver know, you have a hat, somebody's hat is on your car and I'm trying to help you out. That's fine, but that isn't the case here. Conceptually, what we're dealing with is a police officer trying to advance a law enforcement purpose in this search. Now, he tried, this officer, to make clear that he wasn't doing a criminal search, and if you read in context my cross-examination of Officer Feer, he was combative, he was argumentative, Judge Shaner was quite patient with him and on several occasions finally ordered him to answer the questions I was posing to him regarding what he was searching that purse for. And finally, out of exasperation after being ordered by the court to answer my questions, he said to get the driver's license. So, we do not have a situation in which any community care-taking function is being served by the search of this purse. This is being searched to carry out an administrative duty of law enforcement having nothing to do with the well-being of a Lindemann-Elna defendant. Now, there is a provision of the law having to do with the administrative duties of the police officers in carrying out a search to obtain a driver's license. And in this particular case, there was no pressing need for that to be done on an exigent basis. There was no emergency. He had the purse in custody. It was being held. And by the way, there was no evidence this was justified as an inventory search. You say she was in custody. No, the purse was in custody. Mr. Johnson, did he go to the hospital as well? He did. He went to the hospital and he was in the hospital in a position where he could have questioned any of the emergency personnel and according to the Colorado Supreme Court, if there were any other reasonable means of gathering information to get the license or information from the license, that should be explored. For example, the Colorado Supreme Court said the officer could have asked a nurse, doctor, or hospital admissions office to provide the name and address of the defendant in left directions for the defendant to get in touch with him. Was she lucid? Well, we know this. She was able to intelligently talk with the police officer because I specifically asked the police officer, was she able to intelligently speak with you, and he said yes. And they conversed with each other for a period of time. Was there any family member that was at the hospital? Her mother appeared at the hospital later. I believe that was at the Evansville Hospital. But the mother was known to this police officer, as was Melinda Waddell. In fact, years earlier, this police officer had been to Melinda's home with her mother. At this time, she wasn't living there, but she was not a stranger. And it's a small rural community in southeastern Illinois. He could have easily located her, and her mother knew this police officer from contacts with him at the bank. So these are not strangers. He talked with her intelligently. He never once asked her consent for him to look into her purse. Under the statute, upon demand, a person is to surrender a license, but he never made that demand. Rather, he took it upon himself unilaterally to wait until she left the scene and then takes her purse and starts looking through it, and it is not for her benefit but for his to complete a police report. I would suggest to you, if you follow the reasoning, which is good, valid, and current from the Colorado Supreme Court, en banc, unanimous, and the Arkansas Appellate Court in Evans, you will reverse this decision. The state cites to the 1969 Illinois case of People v. Smith, but it's interesting, the Colorado Supreme Court addressed that very case in the body of its opinion and distinguished that case. In People v. Smith, the Illinois court in dicta mentioned that it may be appropriate for a police officer to look through one's purse, or in this case a wallet, to gather information that could be helpful for providing medical assistance to those assisting the defendant at the hospital. But unlike that case, I have raised as a defense in this case the motivation of the police officer in looking through the purse, and our police officer has taken that argument off the table by making clear he had no interest in helping out Melinda. He's not looking at that license to get medical information. It's the farthest thing from his mind. Well, let me ask you this. You just mentioned the People v. Smith case. I thought that the bag that was found was not in the interior of the purse. It was in, like, a side area or something. In your case, where was the... It was in the purse. But it wasn't in the actual interior. Wasn't it in a side pocket or something? It was within a pocket within the purse. He was looking for the wallet to gain access to the license, which he thought would be there. But he didn't get the license out necessarily. He got a bag out of a compartment in the purse. Somewhere within the purse. The record is not exactly as clear as it could be, but it was somewhere within the body of the purse that he had searched, that that was taken from. And under these circumstances, it seems quite clear that we are either going to have a privacy-recognized right that is protected or we're not. And police officers, if they want to carry out duties under the caretaking doctrine, can freely do so. But if they have to be honest about it and say, this is why I'm searching the purse. If that were the case, I wouldn't be here. But he made clear that wasn't his objective. And from the quoted language, the sole reason was to get a license to do a police report. And so if we take this police officer at his word and we follow the recognized lead of other jurisdictions, and no Illinois case to my knowledge has addressed squarely this issue where the purpose of the law enforcement officer in searching is at issue and, to my knowledge, has upheld the search under these circumstances. Well, haven't all the Illinois cases you've found been inventory searches? I cited a lot of inventory search cases, which this is not one, but those cases were cited for the purpose of establishing that it is appropriate to seize something at an accident scene, such as a briefcase that's strewn about security. Later you can get a warrant. Later you can, if you have administrative procedures to go through to get it, you can do that. But that wasn't done here either. I thought most of those cases there, people were incarcerated. Well, that's true. They were incarcerated or they were otherwise unavailable in our case. But the point being is there's a big difference between securing something and searching it. And in this instance, I commend the officer for taking the purse out of the area where it was subject to the elements. But when he took the next step and went into an area that has a high expectation of privacy, and it's not for the benefit of the defendant but for his administrative convenience, he shouldn't have done that, particularly if there were other alternatives that he could have explored, none of which were done. The people were known to him. She was at the hospital. She spoke intelligently. She conversed with him. She was not unconscious. And he just, for whatever reason, didn't do those things that he should have done. And under these circumstances, it appears to me that the community caretaking doctrine does not apply. There's no other exception to the warrant requirement that would be applicable. And the reasoning of the trial court was terribly flawed when the trial judge said this is justified because a police or a driver's license might have information that could be helpful to an insurance company at a later date. That reasoning doesn't stand the test of the authorities that I have cited to the court. So anything further I could say would just be repetitious. I am open to any questions. But my argument, again, can be condensed to the decision and reasoning of the People v. Wright case. And in that particular case, the court said, Officer Neville's purpose in searching the purse was not to obtain information that might possibly be useful in diagnosing or treating the defendant. On the contrary, his sole purpose was to obtain a driver's license and other information. And the court went on to hold that as a matter of law. And that case was reversible error. And the court talked about the purpose behind the requirement that we look at the officer's motivation in doing that because otherwise we will open the floodgates to an officer inventorying or looking through any personal effects of a person under a theoretical construct that maybe under some other case that would be appropriate. But even if it didn't matter here, we're going to okay the search. So I would respectfully ask this court to apply that reasoning and that authority and reverse the trial court. Thank you. Thank you, counsel. Counsel? May I please record, counsel? My name is Sharon Shanahan, and I represent the people of the state of Illinois. Since the defendant says that all you have to do is read People v. Wright, the case from Colorado, I think that's an appropriate place for me to begin for a couple of reasons. First of all, as this court is well aware, the findings of the courts of other states are not binding on the appellate court. They don't need to be followed, especially when the Illinois Supreme Court has addressed the issue. And I submit to you that's exactly what the Illinois Supreme Court did in People v. Smith. I'm not sure, but I think I heard the defense counsel refer to the language in Smith as dicta, and that was a pretty surprising word to hear to me because I think Smith is very clear in what it says. Smith notes that everyone is aware that a wallet typically contains cards or other materials identifying its owners. One of the reasons for this is to permit the owner's identification in the event of illness or accident and frequently to identify the person to be notified in case of emergency. I would note nowadays that it's also used to determine organ donation and stuff like that. The Smith court goes on to say it would not be unreasonable to consider that the wallet might provide information of value in the handling of a wounded man, such as information concerning his blood type, being a diabetic, being unable to tolerate certain medications or anesthetics, and religious affiliation. Taking the wallet to identify a semi-conscious man was not an unreasonable conduct by the officer. And even though it was apparently not necessary to use the wallet to identify the defendant, that factor did not disturb the reasonableness of its being taken. I think Smith is right on point on this case, and I see no reason for this court to look to other jurisdictions to decide this issue. In any case, Wright is readily distinguishable from this case. The injured person in Wright was not in a life-or-death situation. There were no serious injuries. The person wasn't hurt very badly at all in Wright. And at the time of the search, which actually occurred in the hospital, the defendant was in the X-ray room of the hospital. She was conscious and coherent, not seriously injured, and fully able to disclose information. And the police officer in Wright said that he knew he could go into the X-ray room and talk to this person over there. In Smith, our Supreme Court noted that the defendant was seriously injured and in semi-conscious condition, and that a search of his wallet for identification and information might help in treating the defendant. Ms. Smith found the police officer's conduct constitutionally reasonable, and that the incriminating note covered for the wallet was properly admitted into evidence during the defendant's murder trial. Do you think it matters that here the officer knew who she was, and he knew that she was behind the hospital, and she was lucid? Here's where I have one of my biggest conflicts with the facts represented in the defense brief, is whether this police officer knew this woman, and what he knew about her. I would say he did not know her, he knew of her. Well, that he knows her name. Not necessarily. He hasn't seen her, hasn't even laid eyes on her in four years. She's moved since then, we know that. She lives in Indiana, moved to Indiana in 2006, which is after the police officer last saw her. The detective here said that his language was much less clear, that he was aware of her, I believe is what he said. He certainly didn't know where she lived. As I said, he had not seen her in four years. She's a woman at an age where she is very likely to have a different last name than she had four years earlier, when she would have been in her late teens. When the first time Detective Fear met her was when she was a young teenager, when her brother wanted her to come out to look at a house, I mean a car that he was thinking about buying, and have the dog sniff it. So this is just a cop coming to a house, doing a sniff, and leaving again. Not something that's going to stick in his mind ten years later. Miss Shanahan, what are you talking about, having a dog sniff a car? I thought it was strange too. The record says her brother wanted to buy a car, and apparently the person he was trying to buy this car from wasn't a real reputable person. He wanted to make sure there was no drugs in his car before he bought it. So he asked somebody from the police department to come out and sniff the car, so that he would later on... Very interesting. That's what the record says. Kicking tires is passe now. Yeah, that's what I was thinking. I thought that's never a concern I've had when I bought a used car. I didn't know it was the police service that was off. Well, I didn't either. But as I said, that was a decade earlier. That's the only time he was ever at the defendant's mother's house. Only time ever. And then the only other contact he had with the defendant in that tenure were two minor investigations. One was seven years earlier, one was four years earlier. Even the defendant admitted that they were very brief encounters. They were not at her home. As I said, she moved to Vincennes in 2006. A police officer certainly wouldn't have known that, because he hadn't laid eyes on her since then. And the contact he has with the defendant's mother is that she's the teller at his bank. I would really hate to depend upon the tellers of my bank to know information about me, or to expect me to know information about their children. I mean, the teller at your bank is certainly someone that, if you saw them at the grocery store, at least I would be inclined to think, well, he looks familiar. The teller might think, he looks familiar, he must be one of the bank customers. But to say that because she is a teller at the police officer's bank, that he should see this woman and think, I don't have to get information from her. I'll go ask her mother, who is the teller at my bank. Well, why not ask her when he's at the accident scene and she's intelligently answering his questions? Or why not go to the hospital with the purse and ask her permission to either get the wallet out, or have her get the wallet out, or her mother get the wallet out, or a nurse get the wallet out? Well, first of all, at the scene, he certainly didn't want to ask the defendant to get the wallet out because she is complaining of severe neck pain. In fact, had a crushed vertebrae that required surgery, two weeks of hospitalization, several months of rehabilitation. She was very seriously injured. So he testified that he had been trained that his whole goal at this point in time is to keep her calm and quiet, and certainly not to be reaching for her purse or her wallet or anything like that. So he also testified that although she spoke at the scene of the accident, that she did not say much because she was crying and she was in a lot of pain. So to say that they had a meaningful conversation is, I think, a big stretch. At the scene of the accident, undoubtedly, the conversation was, don't worry, it's going to be okay, calm down. And as I said, he said his training as a police officer was to keep her calm and quiet, especially given the fact she was complaining about severe neck pain. And as I said, she had a crushed vertebrae that required surgery. It's not surprising she was in. He did go to the hospital, the local hospital. She was only in the local hospital a very short period of time before she was transferred to Effingham. And he did speak to her, but again, she's not in any better shape than she was before. She is either still in a great deal of pain or she's been medicated. He did speak to her then, and I do agree that there was a brief conversation there, and he didn't. Could he have asked for the wallet at that point in time? I don't know because I don't know. The record doesn't reveal a great deal about that conversation other than it was brief. And I think he did at that time ask her what the packets were at first. Now I have a question. When he first opened the purse, he testified he was looking for the wallet. Was it usually a wallet, something large sitting in the center of the purse? Did he explain why he decided to go to the compartments first? Or did he find the wallet and then go to the compartments? He did not do that. He stopped when he found the wallet. He stopped when he found the wallet? And that's what I was asking earlier, is that it said he found the packet in the outside pocket. I mean, generally, most women's purses, the outside pockets are smaller areas, and the interior, the large areas where what you would think could contain a wallet of any size. And he said he didn't remember if he found the wallet first or he found the packet in the outside pocket. Okay, well, I have a very clear recollection in reading the record that he said he had. But obviously, I can't be wrong, too. I felt very certain when I answered your question that the record. We do have his original testimony at the cause hearing, which became part of that. So there are two different things. Yeah, he testified, so it's possible. But it was my recollection that he looked in the outside pocket first, found the package of powder, and then looked in the inside pocket. Did the outside pocket with the packet you said he found there, did he testify that it looked like a wallet in the outside pocket? The defendant had actually gotten on eBay, and the original purse was destroyed. She got on eBay and found what she says was an identical purse. And it's not in the record, but it was at the hearing, and they did explain about all of it. I would note that more and more nowadays with debit cards and stuff like that, that more and more people are using a very small wallet that doesn't carry a checkbook or a lot of cash in it anymore that would fit very reasonably. And he also, this is pure speculation on my part, so I guess it doesn't belong here, but I would say that they may have been trying to minimize the intrusion into her purse by starting with the least intrusive part of it, as I said, that's pure speculation on my part. A very important thing that I wanted to note is that the defense counsel has made much of the police officer's testimony that the reason he did this was because he wanted to fill out the accident report. In People v. Lewis, the court discusses the community caretaking, I mean the emergency assistance exception to the search. And one of the things that the Lewis court notes is that the detective's motives for searching are immaterial. And that under Lewis, whether the police officer was looking for the driver's license in order to fill out his report or whether he was looking for the driver's license in order to find out medical information and health insurance information would have been immaterial. There is quite a bit of information that does go into a driver's license report, including the driver's license number, the person's address, the person's name, their address, their phone number, the driver's license number, all information that there's no other source for but. Certainly the driver's license number can't come from nowhere but. And I would also note that this wasn't an optional thing that Trooper Beer was doing. He is required by law to fill out this report promptly. And I also think it's very important that the trial court very clearly stated that no evidence, there is no evidence that the deputy used the need-to-obtain-information-for-the-accident report as a subterfuge for a warrantless search for contraband. He was there, he heard the testimony and sought Detective Beer's testimony and found nothing, absolutely nothing to indicate any subterfuge. Now, when it comes right down to it, the thing that matters in any search is reasonableness. That's what we really have to look at in Katie v. Dombrowski. The United States Supreme Court says the ultimate standard set forth in the Fourth Amendment is reasonableness. And I think it is reasonable for a police officer in this situation, it's a small-town cop out in the middle of nowhere basically when this happened, the injured party was taking care of the injured party. He kind of has this vague notion that he's seen her before but he really doesn't know who she is, where she lives, certainly no important information about her. His primary concern is to calm her and care for her and make sure she doesn't exacerbate her injuries until the ambulance arrives. He actually had to cut her out with the jaws of life. And then once she was gone, then he sees the wallet, I mean the purse, I think it is entirely reasonable for him at that time. Had he continued past finding the driver's license, then I think we would have a different situation here. But he wanted to do one thing, which was get the driver's license. He interfered no more than he had to to get the driver's license. And I think under the circumstance of this case, I think under our Supreme Court's ruling in Smith, that his actions were reasonable. I think under the United States Supreme Court's decisions in Nebraska, that his actions were reasonable. And I would ask this Court to approve. Thank you. My colleague asked the Court to focus on reasonableness. I asked the Court to focus on reasonableness in the context of the facts. Reasonableness would be one thing if the officer were motivated to be finding something for the benefit of the defendant. That is to say, medical information on a driver's license. That's not the case. This is a non-emergent situation for a clerical report that did not present any pressing need for him to go as far as he did into this woman's purse. Secondly, so as to leave no doubt in the record about how well he did or did not know my client, and so as to leave no doubt about what was said at the time and how lucid my client was, I direct the Court to the common law record at page 115. The officer testified as follows. Question. And when you arrived, when you were able to engage my client in some conversation at the scene, answer yes. Question. She was able to speak with you. Yes. Question. Could you understand her? And she appeared to intelligently answer your questions. Answer yes. Moreover, at page 30 of the hearing on the motion to suppress regarding how well he knew or recognized my client, the following question was posed at line 2. And did you recognize the defendant when you looked in the car or were you able to identify or when you were able to identify who was in the car? Answer, I recognized her when I was talking to her. He left no doubt this was not a stranger. He recognized her. He knew her. He had passed contact with her. He had been to her house. He knew her mother. The State wants to portray this with a broad brush as if she is somebody unbeknownst to him that will disappear. That's not the case. Insofar as the Illinois Supreme Court decision in Smith that, by the way, was cited by the Colorado Supreme Court and distinguished, it is dicta. The Illinois Supreme Court said in Smith, and I quote, However, the question must be considered as having been waived. For the appellant did not present the point to the trial court and it may not be raised on appeal. The court then said, comment, however, is not inappropriate. And the court went on to give comment that was not determinative, that the court determined had been waived, and it's dicta. When the court doesn't rely on it to make its decision and gratuitously says something, that's dicta. And the court ruled that that issue had been waived. This was a post-conviction proceeding. And in any event, on the substance of the matter, the defendant did not argue, as I have done before this panel, that we should focus on the purpose of the officers conducting of the search. That was not raised in that particular case. The court spoke in broad terms that in the search of a purse or a wallet in that particular case following an accident, it's not inappropriate to do that as a general proposition. But I have raised a more specific issue for this court, and that is to say, let us look at the purpose of the officer as other courts and other jurisdictions have done. And if we do that, I think we will come down as the unanimous Colorado Supreme Court did and hold that this search was not appropriate and was reversible error. My client was able to give consent. She was intelligently engaged in conversation. She spent, as I recall, 10 or 15 minutes at the scene with the officer. He never asked to see her purse, never made a demand for her license, never did anything that the statute requires him to do before he can seize that license. The statute makes quite clear that the officer, upon demand, shall be presented the license. He did not make a demand or request or ask consent. He did nothing. He took it upon himself to look through her purse. It was not authorized under the law, and under these circumstances, I respectfully submit, was not reasonable. I respectfully ask this panel to reverse the trial court. Thank you. Thank you, counsel. We take the case under advisement. We appreciate the briefs and arguments of all parties.